**UNITED STATES of America, Plaintiff,**

v.

**ARTICLES OF DRUG ... HORMONIN, etc., Defendant.**

Civ. A. No. 80–587.

United States District Court, D. New Jersey.

Aug. 29, 1980.

426

Robert J. Del Tufo, U. S. Atty., by Charles J. Walsh, Asst. U. S. Atty., Newark, N. J., and Kathleen A. Blackburn, Gen. Counsel FDA, Food and Drug Administration, Rockville, Md., for United States.

Lasser, Hochman, Marcus, Guryan & Kuskin, by Richard L. Zucker, West Orange, N. J., and Hamel, Park, McCabe & Saunders, by Raymond D. McMurray, William R. Pendergast, Peter S. Reichertz, Washington, D. C., for defendant.

## OPINION

MEANOR, District Judge.

This action was commenced on March 3, 1980 by the filing of a complaint for forfeiture pursuant to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* The complaint alleged that the articles of drug Hormonin No. 1 tablets and Hormonin No. 2 tablets were "new drugs", as defined in 21 U.S.C. § 321(p), which had not received approval for marketing pursuant to 21 U.S.C. § 355(b) and, therefore, could not be introduced into interstate commerce under 21 U.S.C. § 355(a). The drugs in question were seized by the United States Marshal at the Cedar Knolls, New Jersey facility of Carnrick Laboratories, Inc. on March 4, 1980. Carnrick filed a notice of claim to the seized drugs on March 14, 1980. On March 26, 1980, Carnrick filed an answer and counterclaim in which Carnrick denied that Hormonin No. 1 and Hormonin No. 2 were "new drugs" subject to premarketing approval by the FDA, counterclaimed for a declaration to that effect and asserted certain affirmative defenses.[1]

Thereafter, Carnrick moved for a preliminary injunction against further seizures of the Hormonin products, requested a remand to the FDA for development of an administrative record and deferral of further enforcement proceedings and sought an order quashing the seizure of the Hormonin products and seeking a return of the seized articles. These motions were heard and denied May 27, 1980. Following an expedited discovery and trial schedule, trial was conducted from July 21 to July 24, 1980. The following constitutes this court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## A. FACTUAL BACKGROUND

Hormonin No. 1 is a fixed combination of three unconjugated estrogens–Estrone, Estriol and Estradiol.[2] Each tablet of Hormonin No. 1 contains .70 mg. Estrone, .30 mg. Estradiol and .135 mg. Estriol. Hormonin No. 2 contains the same active ingredients in double dosage, *i. e.*, 1.4 mg. Estrone, .60 mg. Estradiol and .270 mg. Estriol. The labeling of Hormonin No. 1 and Hormonin No. 2 states that the drugs are indicated in the treatment of moderate to severe vasomotor symptoms associated with menopause, atrophic vaginitis, kraurosis vulvae, female castration and primary ovarian failure. The history of the marketing of the Hormonin products is largely undisputed and bears recitation.

Hormonin No. 1 has been marketed by Carnrick since 1964. On June 2, 1964, J. J. Pisik, then Director of Product Development for Carnrick, wrote Mr. Jules S. Orloff of the "Advisory Opinions Branch" of the FDA. Claimants' Ex. N. Mr. Pisik requested an opinion as to the "new drug" status of the product later denominated Hormonin No. 1. Mr. Orloff responded by letter of June 30, 1964 and stated "[t]his article [Hormonin No. 1] would not require clearance under the new drug procedure with adequate labeling." Claimants' Ex. O. Carnrick began marketing Hormonin No. 2 in 1966. It appears that no such opinion letter was obtained from the FDA relative to Hormonin No. 2.

In order to place the issuance of the 1964 opinion letter in its proper context, it is necessary to briefly recount the salient events in the somewhat convoluted history of drug regulation by the federal government. That history is detailed in *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207

---

1. Included among those defenses were (1) a defense based upon a June 30, 1964 opinion letter issued by the FDA; (2) the lack of an administrative record concerning the "new drug" status of Hormonin No. 1 and Hormonin No. 2; (3) the failure of the FDA to respond to Carnrick's Citizen Petition, filed pursuant to 21 C.F.R. § 10.30, concerning the status of the Hormonin products; and (4) the alleged viola-

tion of the FDA's Compliance Policy Guide in pursuing this enforcement action.

2. An "unconjugated" or "free" estrogen is one not attached to another molecule. Conversely, "conjugated" estrogen is that attached to another molecule. Estrogens are found in both forms in the body. Tr. at 28–29 (Dr. Archer).

(1973); *Ciba Corp. v. Weinberger*, 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *USV Pharmaceutical Corp. v. Weinberger*, 412 U.S 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973); *United States v. Articles of Drug (Lannett)*, 585 F.2d 575 (3d Cir. 1978); *Hoffmann–LaRoche, Inc. v. Weinberger*, 425 F.Supp. 890 (D.D.C.1975).

In 1962, Congress redefined "new drug", 21 U.S.C. § 321(p)(1), to include drugs not generally recognized as effective as well as safe. FDA was directed to refuse approval of a New Drug Application (NDA) or withdraw prior approval if "substantial evidence", as defined in 21 U.S.C. § 355(d), of effectiveness was lacking. All manufacturers having NDA's for safety effective prior to 1962 were given two years in which to develop such evidence of effectiveness. No NDA would be withdrawn due to lack of effectiveness during that period. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. at 613–14, 93 S.Ct. at 2475.

FDA had approved over 9,000 NDAs for safety between 1938 and 1962. Additionally, thousands of drugs had been marketed without premarketing clearance. These "me–too" drugs had been marketed by, in effect, "coattailing" on the NDA of the pioneer drug. Some manufacturers had obtained advisory opinion letters from the FDA stating that its product was generally recognized by qualified experts as safe. *Id.* at 614, 93 S.Ct. at 2475.

FDA was unable to complete the task of reviewing all marketed drugs for efficacy within the two year period. Thus, FDA retained the National Academy of Science–National Research Council (NAS–NRC) to study and assess the efficacy of drug products by class. This study, denominated "Drug Efficacy Study", was submitted to the FDA for evaluation and was subject to acceptance or rejection by the FDA. *Id.* at 614–15, 93 S.Ct. at 2475–76; *United States v. Articles of Drug (Lannett)*, 585 F.2d at 578. Pursuant to the NAS–NRC findings, FDA published its assessment as to whether a drug product was considered effective as required by the amended statute. These assessments are known as "DESI" notices. *Id.* On January 23, 1968, FDA announced that the DESI notices would be applied to all drugs, including "me–too" drugs. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. at 615, 93 S.Ct. at 2475; *Hoffmann‑‑LaRoche v. Weinberger*, 425 F.Supp. at 893. Thereafter, on May 28, 1968 the FDA published a notice in the Federal Register under which "all opinions previously given by the [FDA] to the effect that an article is 'not a new drug' [were] ... revoked." 33 Fed.Reg. 7758 (May 28, 1968). *See Hoffmann–LaRoche v. Weinberger*, 425 F.Supp. at 893. This notice also contained a rather ambiguous provision to the effect that, although all such letters were revoked, not all drugs covered by these letters would "be regarded as new drugs," and the FDA would supply current opinions as to when a drug achieved "old drug" status. 33 Fed.Reg. 7758.[3] As pointed out in *Hoffmann–LaRoche, supra*, by virtue of this notice "in 1968, virtually all human prescription drugs were regarded as new drugs." 425 F.Supp. at 893.

Dr. S. Rao Kolli, Director of Technical Affairs for Carnrick from 1973 to 1976, testified on deposition that he understood the above notice to have operated as a revocation of the June 30, 1964 opinion letter. Govt. Ex. 1001 at 12. Dr. Kolli also testified that he informed Edmond J. Bergeron, president of Carnrick, that an NDA was necessary for Hormonin No. 1 and Hormonin No. 2. Govt. Ex. 1001 at 12–13. Mr. Bergeron indicated, on deposition, his awareness that such letters had been generally rescinded by the FDA. Govt. Ex. 1101 at 39–40. Mr. Bergeron confirmed, at trial, that he was made aware of this notice, but stated that Dr. Kolli had informed him that the notice did not affect Hormonin. Tr. at 592–93.

In the DESI review, NAS–NRC reviewed and approved drugs containing conjugated Estrone and Estradiol Dipropionate. 37

---

**3.** This notice is currently codified at 21 C.F.R. § 310.100.

Fed.Reg. 14826 (July 25, 1972). It has been stipulated, however, that Estriol was never DESI reviewed. Tr. at 633. *A fortiori*, the combination drug that is Hormonin has never been DESI reviewed.

In 1975, studies were published in which an association between the prolonged use of estrogens and an increased risk of endometrial cancer in post–menopausal women was reported. 41 Fed.Reg. 43117 (Sept. 29, 1976). This notice proposed regulations concerning labeling of estrogenic drug products and requiring, *inter alia*, the inclusion of an insert with each prescription providing information to the patient. The notice covered a large list of "drug entities" including Estradiol, Estriol and Estrone. *Id.* The regulations were promulgated in final form at 42 Fed.Reg. 37636 (July 22, 1977).[4] It appears to be undisputed that Carnrick has complied with these and all other regulations concerning the labeling of estrogenic drug products. *See* Tr. at 191.

Carnrick filed a proposed NDA for Hormonin No. 1 and Hormonin No. 2 on August 28, 1978. Claimants' Ex. S. According to Carnrick, the purpose of this filing was to ascertain the FDA's opinion of studies done on Hormonin and what, if any, additional clinical work was needed. Tr. at 594; Govt. Ex. 1001 at 47–48.

By letter of October 4, 1978, the FDA informed Carnrick that its proposed NDA was "not sufficiently complete to merit a critical medical review." The FDA refused to file the proposed NDA. Govt. Ex. 1112.

On January 11, 1979, Dean M. Graham, President of D. M. Graham Laboratories, Inc., manufacturer of the Hormonin products for Carnrick received "Regulatory Letter BUF 79–1–J" from the FDA. Claimants' Ex. T. That letter informed Dr. Graham that Hormonin No. 1 and Hormonin No. 2 were "not covered by" an approved NDA or Abbreviated New Drug Applica-

tion (ANDA). The letter went on to inform Dr. Graham of Compliance Policy Guide 7132c.08 which "sets forth FDA's regulatory policy with regard to marketed new drugs without approved NDAs or ANDAs."[5] The "Regulatory Letter" noted that the priorities established in the Compliance Policy Guide did not "preclude taking action against drugs outside of the established priorities" and that the agency was prepared to proceed against the Hormonin products "on the basis of significant new information bearing on the safety of these classes of drugs." The letter continued, stating

> Since your above referenced products are identical, similar, or related to an estrogenic drug entity within the meaning of 21 CFR 310.6 ... they are now subject to the same requirements for marketing as the DESI reviewed drug and thus, are regarded to be new drugs within the meaning of Section 201(p) [21 U.S.C. § 321(p)] of the Federal Food, Drug and Cosmetic Act and are subject to the provisions of Section 505. [21 U.S.C. § 355]

The "DESI reviewed drug" that was "identical, similar or related to" the Hormonin products was not identified. The new safety information apparently referred to the studies concerning endometrial cancer and its association with estrogen use in post–menopausal women.

On January 19, 1979, Dr. Kolli wrote Tom Chin of the Division of Metabolism and Endocrine Drug Products of the FDA requesting that Carnrick's proposed NDA for Hormonin be withdrawn and "resubmit[ed] ... to the Generic Drug Division as an abbreviated NDA." That letter referred to the notice establishing the "Patient Package Insert" requirement, *see* 41 Fed.Reg. 43117, as indicating that Hormonin was "DESI related." The letter purported to confirm a telephone conversation with Dr.

---

4. The validity of these regulations was recently upheld in *Pharmaceutical Mfrs. Ass'n v. Food & Drug Admin.*, 484 F.Supp. 1179 (D.Del.1980).

5. This guide had apparently been developed by the FDA as a result of the court's decision in *Hoffmann–LaRoche, Inc. v. Weinberger, supra,*

holding that the FDA policy of permitting marketing of generic versions of pioneer drugs prior to approval of an NDA or ANDA was violative of the 1962 amendments to the Federal Food, Drug and Cosmetic Act. 425 F.Supp. at 894.

Marvin Seife, Director of General Drug Monographs of the FDA who had "agreed to accept an [ANDA] on" Hormonin. An ANDA on Hormonin was filed January 26, 1979. A January 29, 1979 letter from Dr. Kolli to Dr. Seife emphasized the need for expedition due to "pressure from the Compliance Division" and reiterated that Hormonin was "DESI related." Claimants' Ex. U.

Dr. Seife responded by letter of February 29, 1979 informing Carnrick that "no provision has been made for this preparation to be filed as an [ANDA]." Claimants' Ex. V. Thus, the application was not accepted and would "not be reviewed [by FDA] at this time." Enclosed with this letter was a copy of proposed FDA regulations, published at 43 Fed.Reg. 39126 (Sept. 1, 1978), which made it clear that an ANDA was acceptable only where the drug product was identical to the DESI–approved product. It seems clear that the Hormonin products were not eligible for ANDA consideration under this standard since Estriol was never reviewed under DESI and the combination of these three ingredients was never reviewed in either of the marketed dosages.

On April 11, 1979, Carnrick presented the FDA with a protocol for clinical testing of Hormonin No. 1 and Hormonin No. 2. The FDA responded May 10, 1979 making certain comments concerning the protocol and assumed the protocol was related to the previously submitted proposed NDA. In June 1979, the FDA requested that marketing of the Hormonin products cease. Carnrick complied in July 1979. On November 16, 1979, Carnrick returned the Hormonin products to the market. On that date, Carnrick also filed the aforementioned "Citizen Petition." Carnrick therein requested a finding that the Hormonin products were medically necessary, thereby permitting their marketing while scientific studies were completed. Claimants' Ex. W.[6] On the same date Carnrick filed a petition seeking a stay of regulatory action. Claimants' Ex. X. The FDA has never acted on either of these requests.

It is undisputed that no effective NDA or ANDA exists for Hormonin No. 1 or Hormonin No. 2. Govt. Ex. 1505; Stipulation of Facts, ¶ 6. It is also undisputed that Hormonin No. 1 and Hormonin No. 2 are drugs within the meaning of 21 U.S.C. § 321(g)(1), Stipulation of Facts, ¶ 1, and that the products have been shipped in interstate commerce. Stipulation of Facts, ¶¶ 2–5.

## B. LEGAL STANDARDS

 The primary issue presented is whether Hormonin No. 1 and Hormonin No. 2 are "new drugs" as defined in the Federal Food, Drug, and Cosmetic Act. The term "new drug" is defined in 21 U.S.C. § 321(p) as follows:

(1) Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed,

---

6. The claimed authority for such a procedure is contained in Paragraph XIV of the order entered in *American Public Health Ass'n v. Veneman*, 349 F.Supp. 1311 (D.D.C.1972) which states, in pertinent part,

 [a] limited number of drugs may remain on the market pending completion of scientific studies to determine effectiveness where there is a compelling justification of the medical need for the drug.

 Claimants' Ex. W at 3.

 The opinion in *Veneman* clearly indicates that this order was intended to relate solely to certain DESI reviewed drugs found inefficacious. The combination of active ingredients in Hormonin did not undergo DESI review. There is, therefore, no basis for inclusion of Hormonin in the above quoted order. Additionally, an alleged "compelling medical justification" is, I believe, irrelevant to the issue of whether the Hormonin products are "new drugs." Finally, the factual basis of the alleged "compelling medical justification" is rather weak. None of the expert witnesses testified that Hormonin was the drug of first choice in estrogen replacement therapy. At best, Hormonin appears to be the drug of second choice for patients unable to tolerate other estrogenic preparations, notably Premarin. *E. g.,* Tr. at 70, 80 (Dr. Krantz).

recommended, or suggested in the labeling thereof, except that such a drug not so recognized shall not be deemed to be a "new drug" if at any time prior to the enactment of this chapter it was subject to the Food and Drugs Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of its use; or

(2) Any drug (except a new animal drug or an animal feed bearing or containing a new animal drug) the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.

21 U.S.C. § 321(p)(1), (2). If a drug product falls within the definition of "new drug", the drug product may not be marketed prior to approval by the FDA of an NDA or ANDA. 21 U.S.C. § 355(a). The definition of "new drug" must be liberally construed in order to effectuate the policy of the statute, the protection of public health and safety. *United States v. An Article of Drug . . . Bacto–Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969). Stated conversely, the situations in which a drug product is not a "new drug" are narrowly defined, and the exclusions from "new drug" status must be strictly construed. *Premo Pharmaceutical Laboratories, Inc. v. United States*, 629 F.2d 795, 802 & n.7 (2d Cir. 1980). A pharmaceutical manufacturer is not permitted to substitute its judgment for that of the FDA. Nor is the court required "to develop its own body of scientific knowledge in substitution for . . . the FDA." *Id.* at 802. Thus, while a district court certainly is empowered to ad-

judicate the "new drug" status of a given drug product, *id.* at 801, inquiry is limited to the question of "general recognition." *Id.* at 803; *AMP, Inc. v. Gardner*, 389 F.2d 825, 831 (2d Cir.), *cert. denied*, 393 U.S. 825, 89 S.Ct. 86, 21 L.Ed.2d 95 (1968). A district court is not empowered to evaluate the actual safety and effectiveness of a drug product. That determination is committed to the FDA due to its superior access to technical expertise. *Premo Pharmaceutical Laboratories, Inc., supra*, at 804; *see Weinberger v. Bentex Pharmaceuticals, Inc.*, 412 U.S. at 653–54, 93 S.Ct. at 2494.

 The plain language of 21 U.S.C. § 321(p) mandates that a manufacturer establish (1) that the drug product is "generally recognized" as safe and effective by qualified experts under the conditions prescribed *and* (2) having achieved such recognition, the drug has "been used to a material extent or for a material time under such conditions" in order to transcend "new drug" status. *Premo Pharmaceutical Laboratories, Inc., supra*, at 801–802; *see Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 629–31, 93 S.Ct. 2469, 2483–84, 37 L.Ed.2d 207 (1973).

Either a genuine dispute concerning the safety and effectiveness of a drug product or unawareness of the drug product among qualified experts precludes a finding of "general recognition" for purposes of 21 U.S.C. § 321(p). *Premo Pharmaceutical Laboratories, Inc., supra*, at 803 and cases cited therein. Such an expert consensus as to "general recognition" must be founded upon "substantial evidence" as that term is defined in 21 U.S.C. § 355(d).[7] *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. at 632, 93 S.Ct. at 2484. *Accord, United States v. Rutherford*, 442 U.S. 544, 550 n.7, 99 S.Ct. 2470, 2474, 61 L.Ed.2d 68 (1979). Thus, "general recognition" among experts must be based upon " 'adequate and

---

**7.** 21 U.S.C. § 355(d) defines "substantial evidence" as

evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the

basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

well–controlled investigations' ", as well as publication in scientific literature. *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. at 629–30, 93 S.Ct. at 2483 (quoting 21 U.S.C. § 355(d)); *Weinberger v. Bentex Pharmaceutical, Inc.*, 412 U.S. at 652, 93 S.Ct. at 2493. "Anecdotal evidence", *i. e.*, testimony of physicians unsupported by controlled investigation or scientific publication, does not constitute "substantial evidence". *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. at 629, 93 S.Ct. at 2483. The mere fact that a drug product has been marketed for an extended period does not preclude a finding of "new drug" status. *See Tyler Pharmacal Distributors, Inc. v. United States Dept. of Health, Ed. & Welfare*, 408 F.2d 95 (7th Cir. 1969); *United States v. Allan Drug Corp.*, 357 F.2d 713 (10th Cir.), *cert. denied*, 385 U.S. 899, 87 S.Ct. 203, 17 L.Ed.2d 131 (1966).

▪▪▪ With respect to a combination drug, such as the Hormonin products, it must be demonstrated that the combination of ingredients is "generally recognized" as safe and effective. *United States v. An Article of Drug . . . Entrol–C*, 513 F.2d 1127, 1133 (9th Cir. 1975). That is, even if substantial evidence to support general recognition exists concerning the individual components of a drug, there must also be substantial evidence of the safety and efficacy of the combination of the generally recognized components. *Id.; United States v. An Article of Drug . . . Mykocert*, 345 F.Supp. 571, 575–76 (N.D.Ill.1972).

▪▪▪ I am constrained to reject Carnrick's contention that 21 U.S.C. § 321(p)(2), *i. e.*, a drug "used to a material extent or for a material time", affords an alternative ground for a finding of "old drug" status. As stated above, a reading of the plain language of the statute indicates that 21 U.S.C. § 321(p)(1), (2) are two components of the same standard. A drug product is a "new drug" even if "so recognized" unless "used to a material extent or for a material time" in other than investigative conditions. 21 U.S.C. § 321(p)(2). Thus, the single test is two–pronged. A drug product transcends "new drug" status only if "generally recognized, among experts . . . as safe and effective for use under conditions prescribed" and "used to a material extent or for a material time" under non–investigative conditions. *Premo Pharmaceutical Laboratories, Inc., supra*, at 801–802.

Relying upon language in *Weinberger v. Bentex Pharmaceutical, Inc.*, 412 U.S. at 652, 93 S.Ct. at 2493, Carnrick also asserts that in certain cases "general recognition" of a drug product's safety and efficacy may be found without scientific evidence sufficient to obtain an NDA. Carnrick also points to the FDA practice of recognizing the safety and effectiveness of certain Over–the–Counter (OTC) drugs without a showing of "substantial evidence". 21 C.F.R. § 330.10(a)(4)(ii); 37 Fed.Reg. 9464, 9466, 9469 (May 11, 1972). Finally, Carnrick relies upon indication that the NAS–NRC relied upon information other than "well–controlled" studies in the DESI evaluations. *See Drug Efficacy Study, Final Report to the Commission of Food and Drugs, Food and Drug Administration from the Division of Medical Sciences, Nat'l Research Council* at 44–45 (attached as Exhibit B to Carnrick Trial Memorandum); Wardell & Lasagna, *Regulation And Drug Development* at 28 (1975) (attached as Exhibit C to Carnrick Trial Memorandum).

Even if, as the Court in *Bentex* suggested, there are exceptions to the "substantial evidence" rule, this is not an appropriate case to apply such an exception. First, with respect to OTC drugs, approval is contingent upon "controlled clinical investigations . . . unless . . . waived on . . . a showing that it is not reasonably applicable to the drug or essential to the validity of the investigation and . . . an alternative method of investigation is adequate to substantiate effectiveness." 21 C.F.R. § 330.10(a)(4)(ii). Thus an OTC drug presumptively requires clinical investigation of effectiveness. Even if such requirements had been eliminated, as Carnrick contends, such a reduced standard could be rationally based upon the decreased risk to public health presented by OTC drugs.

■ More importantly, however, there are recognized serious health risks associated with estrogenic drugs such as the Hormonin products. The most significant of these risks is the development of endometrial cancer, attested to by several of the experts testifying at trial. Tr. at 24 (Dr. Archer), 130 (Dr. Lipsett), 280 (Dr. Longcope), 336 (Dr. Vande Wiele), 418 (Dr. Jewelewicz). Additionally, estrogenic drug products may cause hypertension, Tr. at 24 (Dr. Archer), increase the risk of breast cancer, Tr. at 24 (Dr. Archer), 130 (Dr. Lipsett) and may result in increases in blood sugar and triglycerides. Tr. at 130–131 (Dr. Lipsett). The health risks associated with estrogenic drug products resulted in promulgation of regulations requiring additional warning information to patients using such products. *Pharmaceutical Mfrs. Assoc. v. Food & Drug Admin., supra.* In light of these recognized risks, Hormonin is simply not an apt subject for exemption from the "substantial evidence" requirement of 21 U.S.C. § 355(d). Thus, I conclude that "general recognition" of Hormonin must be predicated upon "substantial evidence" as defined in 21 U.S.C. § 355(d).

### C. ANALYSIS

It remains to apply these legal principles to the evidence adduced at trial. The government presented seven expert witnesses. There is no serious dispute that each of these witnesses is "qualified by scientific training and experience to evaluate the safety and effectiveness of drugs." 21 U.S.C. § 321(p)(1). I do not believe it necessary to recite the credentials of these witnesses. The *curriculum vitae* of each witness was admitted into evidence, Govt. Ex. 101 (Dr. Archer); 301 (Dr. Jewelewicz); 401 (Dr. Lipsett); 501 (Dr. Longcope); 601 (Dr. Sobel); 701 (Dr. Vande Wiele) and 801 (Dr. Yesair), and each was examined and found qualified to render expert testimony in areas relevant to this action. Tr. at 7–14 (Dr. Archer), 114–122 (Dr. Lipsett), 218–224 (Dr. Longcope), 292–297 (Dr. Yesair), 327–333 (Dr. Vande Wiele), 367–374 (Dr. Sobel), 409–412 (Dr. Jewelewicz). Each testified that, in their opinion, Hormonin No. 1 and Hormonin No. 2 are not generally recognized as safe and effective for use under the conditions prescribed, recommended or suggested in the products' labeling. Tr. at 41 (Dr. Archer), 145–146 (Dr. Lipsett), 255 (Dr. Longcope), 320 (Dr. Yesair), 344–348 (Dr. Vande Wiele), 396–397 (Dr. Sobel), 424 (Dr. Jewelewicz). Dr. Archer testified that he himself did not recognize the Hormonin products as safe and effective and knew of no one that had prescribed the products. Tr. at 41–43. Drs. Lipsett, Longcope, Vande Wiele, Sobel and Jewelewicz also stated that they did not personally recognize the safety and efficacy of the Hormonin products. Tr. at 145, 253, 339, 396, 422. Drs. Lipsett, Longcope, Vande Wiele and Jewelewicz stated that, prior to this litigation, they had not heard of the Hormonin products. Tr. at 141, 250, 337, 419. Several of the government's experts testified that the Hormonin products were not discussed at seminars and conventions at which estrogen replacement therapy was a topic. Tr. at 42 (Dr. Archer), 337–338 (Dr. Vande Wiele), 394–395 (Dr. Sobel), 420 (Dr. Jewelewicz). Several of the government's experts also stated that they were unaware of any publication in the scientific literature concerning the Hormonin products. Tr. at 38–40 (Dr. Archer), 144–145 (Dr. Lipsett), 250–253 (Dr. Longcope), 338–339 (Dr. Vande Wiele), 420–421 (Dr. Jewelewicz). Dr. Lipsett stated that he does not teach the use of Hormonin No. 1 and Hormonin No. 2 in estrogen replacement therapy and was unaware of anyone that did teach the use of these drug products. Tr. at 145. One of Carnrick's expert, Dr. Lemon, was unable to state that Hormonin is generally recognized as safe and effective. Tr. at 483.

Carnrick did not place in evidence the results of any "well-controlled" studies concerning the safety and efficacy of the combination of active ingredients in the Hormonin products. Carnrick eschewed reliance upon three articles that had been published which mentioned the Hormonin products. Tr. at 34–38. One of Carnrick's experts, Dr. Asch, testified that the literature on

Hormonin is "very thin", and that clinical tests were important in order to ascertain whether the Hormonin products are efficacious. Tr. at 530–531. With respect to Estriol, there have been no "well–controlled" studies done in the United States concerning that drug's effectiveness in estrogen replacement therapy. Tr. at 388–391; Govt. Ex. 601. Additionally, it has been stipulated that the combination of active ingredients in the Hormonin products is not listed in the United States Pharmacopeia. Stipulation of Facts, ¶ 10. Carnrick was, as early as 1967, aware of the "urgent" necessity of a "published clinical study" concerning Hormonin. Govt.Ex. 1103.

Carnrick, of course, produced a set of equally qualified experts. As with the government experts, the *curriculum vitae* of each was admitted into evidence, Claimants' Ex. A (Dr. Vorherr); E (Dr. Krantz); G(1) (Dr. Tyrer); H(1) (Dr. Lemon); I(1) (Dr. Asch); AA (Dr. Smith), and each was examined and found qualified to render expert testimony in areas relevant to this case. Tr. at 59–66 (Dr. Krantz), 166–171, 173–174 (Dr. Tyrer), 430–437 (Dr. Lemon), 487–492 (Dr. Asch), 532–536 (Dr. Smith); Claimants' Ex. AB at 4–9 (Dr. Vorherr). Dr. Krantz testified that the Hormonin products are his drug of second choice for patients unable to tolerate Premarin, another estrogenic drug. Tr. at 70, 72. Dr. Krantz stated that he has prescribed the Hormonin products for 15 years, that the use of Hormonin is taught at the University of Kansas Medical School and that its use was discussed at meetings and seminars at which estrogen replacement therapy was discussed. Tr. at 74–76. Dr. Krantz was of the personal opinion that the Hormonin products were safe and effective, Tr. at 74–75, and believed them to be generally recognized as safe and effective. Tr. at 77–78.

Dr. Tyrer, a practitioner in the area of obstetrics and gynecology, indicated that she prescribed Hormonin in her practice. Tr. at 175–176. Dr. Tyrer testified that she believed the Hormonin products to be generally recognized as safe and effective. Tr.

at 191–193. Drs. Asch and Vorherr took the same position. Tr. at 519–520; Claimants' Ex. AB at 31–32. It is undisputed that the three active ingredients of the Hormonin products occur naturally in the human female. *E. g.* Tr. at 15 (Dr. Archer), 494 (Dr. Asch). Dr. Tyrer was a participant in the FDA panel that reviewed estrogenic substances as a class. She testified that the FDA panel concluded that, although there was an increased risk of endometrial cancer among post–menopausal women undergoing estrogen replacement therapy, "the benefit of estrogen outweighed the risk insofar as whether . . . the drug should remain on the market." Accordingly, the aforementioned labeling regulations were promulgated. Tr. at 184–191. It is undisputed that each of the active ingredients of the Hormonin products were covered by these regulations. 41 Fed.Reg. 43117. Drs. Krantz and Tyrer stated that they had prescribed the Hormonin products, in part, "because it contained the three estrogens . . . naturally found in the female body when the woman is . . . producing her own estrogen hormones." Tr. at 178–179 (Dr. Tyrer), 70 (Dr. Krantz).

A great deal of evidence was presented as to the requirements for a "well–controlled" investigation of a product such as Hormonin. Recitation of that evidence is unnecessary since Carnrick has introduced no studies which purport to be "well–controlled" investigations. Additionally, the various experts testified at some length concerning menopause and its symptomology, *e. g.*, Tr. at 18–23 (Dr. Archer), the general concept of estrogen replacement therapy, *e. g.*, Tr. at 276–277 (Dr. Longcope) and the absorption process of orally administered estrogens, both conjugated and unconjugated, in the body, *e. g.*, Tr. at 28–30, 49–53 (Dr. Archer). Furthermore, the parties submitted evidence concerning a theory, known as the "Lemon Hypothesis", that Estriol operates as a protective mechanism against development of breast carcinoma due to the action of Estradiol. *E. g.* Tr. at 460 (Dr. Lemon). I am in no position to resolve the dispute on the validity of this hypotheses.

Nor am I in a position to resolve questions concerning possible absorption problems associated *with* orally administered free estrogens. *Compare* Tr. at 29–30 (Dr. Archer) *with* Tr. at 82–86 (Dr. Krantz). As I stated earlier, the issue in this case is not actual safety and efficacy. That is a question committed to the FDA.

██ Rather, I must determine, under the standards explicated previously, whether the Hormonin products are "generally recognized" by qualified experts as safe and effective based upon "substantial evidence" as defined in the Act. I must conclude that they are not so recognized. I am convinced that both the government experts and those presented by Carnrick testified in accordance with their best professional judgment. There is no need to make credibility determinations. The lack of consensus among qualified experts concerning these products is manifest. While I do not believe unanimity is required, there is certainly "a genuine dispute among qualified experts" concerning the safety and efficacy of the Hormonin products. Carnrick submitted no "well–controlled" investigations concerning the combination of active ingredients in Hormonin. The evidence demonstrates that there is a paucity of scientific literature on the Hormonin products. Moreover, Estriol was never reviewed in DESI. The evidence concerning the protective function of Estriol is, at best, mixed. Tr. at 262–266 (Dr. Longcope), 357–359 (Dr. Vande Wiele), 468–469, 472 (Dr. Lemon).

██ Based on the foregoing, I conclude that the Hormonin products are not "generally recognized", based upon substantial evidence, among qualified experts as safe and effective for their labeled indications. As I have previously stated, I do not believe that the use "to a material extent or for a material time" affords a basis of "old drug" status independent of the "general recognition" standard. Having heard all the evidence, it appears to me that Hormonin is no more or less safe and effective than other estrogenic drugs. That, however, is not the issue. We are dealing with a narrow statutory exception from the premarketing clearance requirements of the Act. I do not hold that Hormonin is unsafe or inefficacious. However, since "general recognition" of the safety and efficacy of the Hormonin products has not been established, the products must be scrutinized by the FDA in the context of an NDA before they can be marketed. I conclude that the Hormonin products are "new drugs" within the meaning of the Act which have not received an approved NDA from the FDA and are, therefore, subject to seizure and forfeiture. 21 U.S.C. § 334.

## D. ESTOPPEL

I do not believe the 1964 opinion letter affords any basis for relief to Carnrick. Carnrick argues that the 1964 opinion letter, Claimants' Ex. N, O, concerning the formulation denominated Hormonin No. 1 forms the basis of an estoppel against assertion by the government that the Hormonin products are "new drugs". Carnrick contends that it relied, to its detriment, upon the opinion expressed by the FDA concerning marketing of Hormonin No. 1 and that the FDA never individually apprised Carnrick as to whether the 1964 letter was revoked.

██ The well–established general rule is "that the United States [is] neither bound nor estopped by the acts of . . . [its] agents in entering into an . . . arrangement to . . . cause to be done what the law does not sanction or permit." *Wilber Nat'l Bank v. United States*, 294 U.S. 120, 122, 55 S.Ct. 362, 363, 79 L.Ed. 798 (1935); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); *Lee v. Munroe & Thornton*, 11 U.S. (7 Cranch) 366, 368–70, 3 L.Ed. 373 (1813); *In re Hooper's Estate*, 359 F.2d 569 (3d Cir. 1966). As stated in *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by

delegated legislation ... exercised through the rule–making power." *Id.* at 384, 68 S.Ct. at 3.[8] I note that the above stated general rule has been applied several times in the context of statements and representations made by agents of the FDA. *Bentex Pharmaceuticals, Inc. v. Richardson,* 463 F.2d 363, 368 n.17 (4th Cir. 1972), *rev'd on other grounds,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *AMP, Inc. v. Gardner,* 275 F.Supp. 410, 412 n.1 (S.D.N.Y.1967), *aff'd,* 389 F.2d 825 (2d Cir.), *cert. denied,* 393 U.S. 825, 89 S.Ct. 86, 21 L.Ed.2d 95 (1968); *United States v. 354 Bulk Cartons ... Trim Reducing–Aid Cigarettes,* 178 F.Supp. 847, 853–54 (D.N.J.1959).

I believe that issuance of the 1964 opinion letter concerning the formulation known as Hormonin No. 1 was plainly beyond the statutory authority of the FDA. The 1962 amendments to the Act redefined "new drug" to include a drug not generally recognized as effective as well as safe. Such "new drugs" required premarketing clearance in the form of an NDA. 21 U.S.C. § 355(a), (b). There is absolutely no doubt that Hormonin No. 1 was a "new drug" under the statute in 1964. Carnrick never had an approved pre–1962 NDA for Hormonin No. 1 based upon safety. The combination of ingredients in Hormonin was not DESI reviewed. Estriol was never reviewed in DESI. There is no dispute that Carnrick's submission to the FDA in 1964 did not include the information required in 21 U.S.C. § 355(b). The FDA plainly had no legal authority to permit the marketing of Hormonin in 1964 without an NDA approved for safety and efficacy.

Moreover, the 1968 notice in the Federal Register plainly operated as a revocation of such letters. 33 Fed.Reg. 7758, *see Hoffmann–LaRoche v. Weinberger,* 425 F.Supp. at 893. Carnrick was aware, as early as 1967, that a clinical study of Hormonin was needed. Govt.Ex. 1103. There is evidence that Edmond J. Bergeron was informed prior to 1976 that an NDA for the Hormonin products was necessary because of the aforementioned notice. Govt.Ex. 1001 at 12–13. Although there was an ambiguous proviso in the Federal Register publication indicating that up to date opinions of the "new drug" status of drugs being marketed under such opinion letters would be forthcoming, the notice unambiguously states that the previously given letters were "revoked". 33 Fed.Reg. 7758. The FDA quite clearly had a duty to correct its position concerning these opinion letters when it became clear that the issuance of such letters was legally untenable. *United States v. 60 28–Capsule Bottles, More or Less ... Unitrol,* 211 F.Supp. 207, 215 (D.N.J.1962), *aff'd,* 325 F.2d 513 (3d Cir. 1963). The FDA recognized this duty in the notice published in the Federal Register.[9] Finally, no opinion letter was, apparently, ever secured relative to Hormonin No. 2. There is, accordingly, no basis for an estoppel concerning the marketing of that product.

I have a great deal of sympathy for Carnrick. In a very real sense Carnrick is the victim of bureaucratic ineptitude, the unwillingness of the FDA to follow the 1962 drug amendments and Congress' failure to provide FDA with the tools to accomplish

---

**8.** This, of course, is to be distinguished from a situation in which an officer of the government acts within his authority in binding the government in a transaction. *See, e. g., Walsonavich v. United States,* 335 F.2d 96 (3d Cir. 1964); *American Training Services, Inc. v. Veterans Admin.,* 434 F.Supp. 988, 1001–02 (D.N.J.1977).

**9.** Paragraph (b) of the new regulation stated, in pertinent part,

These informal opinions that an article is "not a new drug" or "no longer a new drug" require reexamination under the Kefauver–Harris Act.... In particular, when approval of a new–drug application is withdrawn un-

der provisions of section 505(e) of the Federal Food, Drug, and Cosmetic Act, a drug generally recognized as safe may become a "new drug" within the meaning of section 201(p) of said Act as amended by the Kefauver–Harris Act on October 10, 1962. This is of special importance by reason of proposed actions to withdraw approval of new–drug applications for lack of substantial evidence of effectiveness as a result of reports of the National Academy of Sciences–National Research Council on its review of drug effectiveness.

33 Fed.Reg. 7758.

the herculean task of reviewing all drug products for efficacy as required by the statute.[10] In my estimation, however, FDA had no authority under the statute to approve the marketing of Hormonin No. 1 in 1964 without an NDA. Accordingly, under the general rule enunciated above, the government is not estopped from asserting that the Hormonin products are "new drugs" under the Act. I have serious reservations as to whether equitable estoppel could ever be invoked to prevent enforcement of the policy of the Act, i. e., the protection of the public health and safety.

### SUMMARY

In sum, I find that Hormonin No. 1 and Hormonin No. 2 are "new drugs" within the meaning of 21 U.S.C. § 321(p). Hormonin No. 1 and Hormonin No. 2 have been introduced into interstate commerce without approval of an NDA. 21 U.S.C. § 355(a), (b). These drug products are, therefore, subject to seizure and forfeiture pursuant to 21 U.S.C. § 334(a). I find no basis upon which equitable estoppel may be applied against the government's assertion of "new drug" status of the Hormonin products.

Accordingly, judgment will be entered in favor of the United States forfeiting the seized quantities of Hormonin No. 1 and Hormonin No. 2. An order in conformity with this opinion will be submitted by the United States with consent as to form if possible.

---

10. Previous actions to compel the FDA to fulfill its mandate under the 1962 drug amendments are reported in *Hoffmann–LaRoche v. Weinber-ger, supra,* and *American Public Health Ass'n v. Veneman, supra.*