UNITED STATES of America, Plaintiff,

v.

ARTICLES OF DRUG ... PROMISE TOOTHPASTE FOR SENSITIVE TEETH * * * Active Ingredients: Potassium Nitrate, Sodium Monofluorophosphate ... Sensodyne-F Toothpaste for Sensitive Teeth * * * Active Ingredients: Potassium Nitrate, Sodium Monofluorophosphate ..., and Block Drug Company, Inc., a corporation, and Leonard N. Block and James A. Block, Defendants.

No. 83 C 6129.

United States District Court, N.D. Illinois, E.D.

July 30, 1984.

**212**

Ann H. Wion, FDA Associate Chief Counsel for Enforcement, Rockville, Md., Michael S. O'Connell, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Alan H. Kaplan, Thomas O. Henteleff, Marc H. Shapiro, David E. Kaplan, Kleinfeld, Kaplan & Becker, Washington, D.C., Thomas P. Sullivan, Daniel J. King, Jenner & Block, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

In this action the United States proceeds on libel of information against several cartons of toothpaste, and seeks injunctive relief against the manufacturer, Block Drug Company, Inc. ("Block"), and its officers Leonard N. Block and James A. Block. Block has filed a claim in the in rem proceeding. The toothpaste, by combining two active ingredients, is intended to combat both caries and dentinal hypersensitivity. This particular combination of active ingredients apparently has never been marketed before, and the United States alleges that the toothpaste is a new drug within the meaning of 21 U.S.C. § 321(p)(1), introduced into interstate commerce without an approved New Drug Application ("NDA") as required by 21 U.S.C. § 355(a). The court has jurisdiction under 21 U.S.C. §§ 334 and 332, as well as under 28 U.S.C. § 1345. Presently before the court is defendants' motion to dismiss or, in the alternative, for other relief. Block moves both as claimant and as defendant. For the reasons stated below, the court denies defendants' motion.

Defendants dispute that the toothpaste is a new drug, but their present motion is based on other grounds, both of which are connected with the massive review of over-the-counter ("OTC") drugs currently being conducted by the Food and Drug Administration ("FDA"). First, defendants argue that a certain FDA Compliance Policy Guide ("CPG") bars the present action pending completion of the OTC review. Although the CPG is in the form of internal enforcement guidance, instructing FDA personnel not to initiate certain regulatory actions, defendants argue that the CPG constitutes a formal advisory opinion, which the FDA is bound to follow until it is revoked. The United States responds that the CPG may not be asserted by defendants as a bar to an enforcement action, and that in any event the CPG does not apply to the toothpaste in question. Second, defendants argue that the court should re-

mand this action to the FDA for an administrative determination, based on a complete administrative record, of whether the toothpaste is a new drug. The United States opposes this suggestion as well. Discussion of both these arguments appropriately is preceded by an overview of new drug regulation and of the current OTC review, including the review of OTC dentifrices.

## I

Federal law prohibits the introduction into interstate commerce of any new drug without an NDA approved by the FDA. 21 U.S.C. § 355(a). The term "new drug" is defined by statute, and its definition underwent a major change in 1962. Currently, to avoid new drug status and the requirement of an approved NDA, a drug must be generally recognized as both safe and effective, for the purposes represented in the drug's labeling. The statutory definition of a new drug reads, in relevant part:

> Any drug ... the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof.

21 U.S.C. § 321(p)(1). The criterion of effectiveness was added in 1962. Drug Amendments of 1962, Pub.L.No. 87–781, § 102(a)(1), 76 Stat. 780, 781. Before the 1962 amendment a drug avoided new drug status if it was generally recognized as safe, without regard to its effectiveness. Food Drug and Cosmetic Act of 1938, ch. 675, § 201(p)(1), 52 Stat. 1040, 1041–42. ■ If a drug is not generally recognized as safe and effective, and thus does not avoid new drug status, it may be introduced into commerce only upon approval by the FDA of an NDA. Currently, an NDA will be approved if, inter alia, the drug is proven to be safe and effective. 21 U.S.C. § 355(d). The criterion of effectiveness was added in 1962, at the same time

that criterion was added to the definition of "new drug." Drug Amendments of 1962, § 102(c). Before the 1962 amendment the FDA reviewed NDAs for safety, but not for effectiveness. Food Drug and Cosmetic Act of 1938, § 505(d).

Drugs already on the market in 1962 were affected differently by the 1962 amendments, depending on whether they were on the market under NDAs, or whether they had avoided new drug status by virtue of general recognition as safe. Drugs marketed under NDAs were subject to having their FDA approval withdrawn; however, they were given a two-year grace period before approval of their NDAs could be withdrawn under the effectiveness criterion. Drug Amendments of 1962, § 107(c)(3). Drugs that were generally recognized as safe were given an apparently permanent exemption from the effectiveness criterion by this grandfather clause:

> In the case of any drug which, on the day immediately preceding the enactment date, (A) was commercially used or sold in the United States, (B) was not a new drug as defined by section 201(p) of the basic Act as then in force, and (C) was not covered by an effective application under section 505 of that Act, the amendments to section 201(p) made by this Act [i.e., the effectiveness criterion] shall not apply to such drug when intended solely for use under conditions prescribed, recommended, or suggested in labeling with respect to such drug on that day.

Drug Amendments of 1962, § 107(c)(4). In addition, some drugs continued to be exempt from new drug requirements under a similar 1938 grandfather clause, which still appears in 21 U.S.C. § 321(p)(1). Food Drug and Cosmetic Act of 1938, § 201(p)(1).

Initially, only drugs covered by NDAs seemed to be affected at all by the 1962 amendments, and the FDA set out to review all the drugs then marketed under approved NDAs, to determine whether they met the new effectiveness criterion. This undertaking was known as the Drug

Efficacy Study Implementation ("DESI"). Primarily because drugs generally recognized as safe tended not to require prescriptions under 21 U.S.C. § 353(b), almost all the drugs reviewed under DESI were prescription drugs. The DESI review covered approximately 4,000 drugs. *Weinberger v. Hynson, Westcott and Dunning, Inc.*, 412 U.S. 609, 621, 93 S.Ct. 2469, 2479, 37 L.Ed.2d 207 (1973). Of that number, only 420 were OTC drugs. 37 Fed.Reg. 85 (1972).

In 1972, as DESI neared completion, the FDA turned its sights to drugs not covered by NDAs, almost all of which were OTC drugs. The 420 OTC drugs reviewed in DESI suggested an unsatisfactory state of affairs. Only about 25% of those OTC drugs were found to be effective for the purposes represented in their labeling. 37 Fed.Reg. at 85. Although OTC drugs that had been on the market since before 1962 ostensibly were shielded from the new effectiveness criterion by the 1962 grandfather clause, the FDA decided nonetheless to subject them to an effectiveness criterion. Instead of applying the effectiveness criterion of the new drug provisions, which the 1962 grandfather clause prohibited, the FDA read such a criterion into the separate prohibition of misbranding. 21 U.S.C. § 352. Drugs covered by the 1938 grandfather clause would be subject to both safety and effectiveness criteria under the misbranding prohibition. In announcing its OTC review, the FDA stated:

> It would be unreasonable and unjust to permit grandfathered drugs to remain on the market unchanged while competitive items must be reformulated and/or relabeled or removed from the market. The same scientific and medical determinations involved in reviewing the safety and effectiveness of nongrandfathered OTC drugs are also involved in determining whether grandfathered drugs are misbranded and thus are properly made in a single proceeding that will apply across the board to all products in a single therapeutic class.

37 Fed.Reg. at 86. The uniform standard to be applied in the OTC review thus would be that of "safe and effective and not misbranded." *Id.* Any drug not meeting this standard would be subject to seizure:

> on the ground that the drug is an unapproved new-drug or is a misbranded drug (if it is exempt from the new-drug definition under the 1938 or 1962 grandfather clause).

*Id.* Grandfathered drugs that were not effective for the purposes represented in their labeling would not be considered new drugs, but they would be considered misbranded and thus required to change their labeling; they therefore would lose their grandfathered status, which was dependent upon their not changing their labeling. *Id.*

Having determined that it would subject grandfathered drugs to an effectiveness criterion, the FDA faced one of the problems which inspired the 1962 grandfather clause: suddenly, all grandfathered drugs were on the market illegally, unless they were effective and thus not misbranded. Estimates of the number of OTC drugs on the market, apparently including those introduced since 1962, ranged from 100,000 to 500,000. Reviewing these drugs on a case-by-case basis would not be possible. The FDA therefore decided to proceed by way of administrative rulemaking, rather than case-by-case basis would not be possible. The FDA therefore decided to proceed by way of administrative rulemaking, rather than case-by-case adjudication, to set standards by which drugs in various categories could be considered safe and effective and not misbranded. Panels of experts would be convened, and they would propose monographs setting standards for various categories of products. The FDA then would study these monographs, amend them if necessary, and ultimately promulgate them as regulations. Drugs conforming to the standards set out in the applicable monograph would be deemed safe and effective and not misbranded, and could be marketed without an approved NDA. Drugs not conforming to standards would be considered new drugs or misbranded drugs, and would be required to submit an NDA for approval. *Id.* at 85–86.

As part of its regulatory strategy of setting standards for categories of drugs rather than reviewing OTC drugs on a case-by-case basis, the FDA adopted a general enforcement stance of deferring regulatory action against individual drugs until the OTC review was completed and the final monographs promulgated. The CPG relied on by defendants, directing FDA personnel not to submit drugs for regulatory action under certain circumstances, evidently derives from this decision to defer action against individual drugs pending completion of the OTC review.

## II

In announcing its OTC review, the FDA proposed 26 broad categories of drugs to be reviewed, one of which was "Dentifrices and dental products such as analgesics, antiseptics, etc." 37 Fed.Reg. at 89; 21 C.F.R. § 330.5 (1983). Shortly thereafter, the public was invited to submit data relevant to this portion of the OTC review. 38 Fed.Reg. 2781 (1973). The Panel appointed to review this category later subdivided the category into five therapeutic classifications: 1) agents for oral mucosal injury, 2) agents for the relief of oral discomfort, 3) anticaries agents, 4) dental plaque disclosing agents, and 5) denture aids. *See* 45 Fed.Reg. 20666, 20667 (1980). Because it is intended to combat both dentinal hypersensitivity and caries, defendants' toothpaste combines categories 2) and 3).

In March 1980 the Panel issued its proposed monograph for anticaries products. 45 Fed.Reg. 20666. The Panel approved several active ingredients for anticaries products, including sodium monofluorophosphate, which is one of the two active ingredients used in defendants' toothpaste. *Id.* at 20682, 20690. The Panel recommended that products combining an anticaries agent with some other agent be considered new drugs and be required to submit NDAs for approval. *Id.* at 20674. In May 1982 the Panel issued its proposed monograph for oral discomfort products. 47 Fed.Reg. 22712 (1982). With respect to potassium nitrate, which is the other active ingredient used in defendants' toothpaste, the Panel concluded that the data in the record were insufficient to allow a determination whether it was effective as a tooth desensitizer. *Id.* at 22725 (table), 22751, 22754. The Panel recommended that certain combinations be permitted, but none of those combinations included an anticaries agent. *Id.* at 22719–23.

In October 1982, during the period for comment on the proposed monograph for oral discomfort products, defendants submitted information relevant to the toothpaste in question, apparently for the first time. (Defendants' memo, ex. I.) In April and September 1983, after the comment period had closed, and after the defendants had begun marketing their toothpaste, defendants submitted additional information. (Defendants' memo, exs. J, K.) During this time the FDA informed defendants that it considered the toothpaste to be a new drug which required an NDA. (Defendants' memo, ex. O.) Eventually, the United States brought this action, and United States Marshals seized the toothpaste.

## III

Defendants move for dismissal on the basis of CPG 7132b.15, which is attached hereto as Appendix A. Alternatively they request that the court order the FDA to adhere to the enforcement directive stated therein. CPG 7132b.15 directs FDA personnel not to initiate regulatory action under some circumstances. It states in part, under the heading "Background and Policy," that:

[p]rior to the final publication of a proposed monograph, it would not be in the agency's interest to pursue regulatory action unless failure to do so posed a potential health hazard to the consumer.

Under the heading "Regulatory Action Guidance," the CPG states in part:

Samples of OTC drugs, not subject to a final monograph should not be submitted for regulatory action consideration on the basis of suspected labeling deficiencies *unless* there is a reasonable basis to conclude that the deficiency constitutes a

potential hazard to health. Examples: 1) documented consumer injuries; 2) drugs requiring the prescription legend marketed as OTC; and 3) unwarranted claims for the treatment of serious disease conditions which could preclude obtaining proper medical attention.

(Emphasis in original.) The United States informs the court that this CPG, which is dated October 1, 1980, superseded a similar CPG issued in 1973. (U.S. memo, p. 13.)

■ Defendants observe that the United States does not allege that their toothpaste constitutes a potential hazard to health, and they argue that CPG 7132b.15 therefore bars this enforcement action. Defendants cite 21 C.F.R. § 10.85(d), which states:

A statement of policy or interpretation made in the following documents, unless subsequently repudiated by the agency or overruled by a court, will constitute an advisory opinion:

\* \* \* \* \* \*

(3) Compliance policy guides issued by FDA beginning in 1968 and codified in the Compliance Policy Guides manual.

Defendants also cite 21 C.F.R. § 10.85(e), which states:

An advisory opinion represents the formal position of FDA on a matter and except as provided in paragraph (f) of this section [relating to immediate and significant health dangers], obligates the agency to follow it until it is amended or revoked. The Commissioner may not recommend legal action against a person or product with respect to an action taken in conformity with an advisory opinion which has not been amended or revoked.

The court believes that defendants' argument must be rejected, at least on the present record, for several reasons. First of all, as discussed above, the decision to defer regulatory action against individual drugs seems to be a response to the great number of drugs already on the market, including drugs which ostensibly were shielded from the new effectiveness criterion by the 1962 grandfather clause. Defendants' toothpaste thus falls outside the primary concern of the FDA's policy of deferring individual regulatory actions. It is doubtful that the FDA intended to instruct its personnel not to initiate regulatory action against unprecedented combination products.

Second, the CPG speaks of "regulatory action consideration *on the basis of suspected labeling deficiencies*" (emphasis added). It is true that the definition of "new drug" depends, in part, on what uses are prescribed, recommended, or suggested in the labeling. 21 U.S.C. § 321(p)(1). Still, the phrase "labeling deficiencies" suggests much more strongly a misbranding charge under 21 U.S.C. § 352. This may be another indication that CPG 7132b.15 is directed mainly at drugs covered by the 1962 grandfather clause, since the effectiveness criterion is applied to them through the misbranding provisions. In any event, the present action is based on a new drug charge, not on alleged misbranding, and it thus seems to fall outside the language of the CPG.

Third, it appears to the court that the passages from CPG 7132b.15 relied on by defendants are not advisory opinions. 21 C.F.R. § 10.85(d)(3) does not make CPGs, or everything in them, into advisory opinions; rather, it confers advisory opinion status on individual "statement[s] of policy or interpretation" made in CPGs. The court has reviewed chapter 32 of the CPG manual. It appears from the court's review of this material that CPGs include several distinct types of statements, usually emphasizing the distinction among them by using the headings "Background," "Policy," and "Regulatory Guidance" or "Regulatory Action Guidance." An example of an advisory opinion, the court believes, is found in CPG 7132b.08. That CPG states under the "Background" heading that there has been uncertainty regarding pharmacists' obligations in filling recorded telephone prescriptions. The CPG then states, under the heading "Policy":

The FDA considers a recorded prescription as meeting the requirements of an "oral prescription," as allowed by Section

503(b), if the pharmacist plays back the recording and concludes that the voice he or she hears is that of a physician known to the pharmacist, and there is no obvious reason for suspecting the authenticity of the recorded prescription.

This quoted passage tells pharmacists that if they handle recorded telephone prescriptions in a certain way they will be in compliance with the law, as interpreted by the FDA. Other examples of advisory opinions appearing under the heading "Policy" can be found in CPGs 7132.05, 7132a.08, 7132b.02, 7132b.06, 7132b.07, and 7132b.09.

By contrast, statements under the headings "Regulatory Guidance" or "Regulatory Action Guidance" generally give enforcement guidance to FDA personnel, without interpreting legal requirements or announcing an FDA policy as to whether something is legal or illegal. In CPG 7132a.03, for instance, the following statement is made under the heading "Regulatory Action Guidance":

Recommendations for regulatory action will be considered in the above instances of adulteration. The regulatory action of choice will depend upon the circumstances of each case. Prime consideration would be given to adulterated drug products which pose a potential health hazard. Consideration will also be given to deviations found to be therapeutically significant. In cases where there is a health hazard, the product involved should be removed from trade channels by the most expeditious means possible; e.g., recall or seizure.

The court does not believe that such a statement is an advisory opinion. Other examples of enforcement guidance appearing under the heading "Regulatory Guidance" or "Regulatory Action Guidance" can be found in CPGs 7132.07, 7132a.10, and 7132b.14.

Almost all CPGs have "Background" sections, and some have both "Policy" and "Regulatory Guidance" or "Regulatory Action Guidance" sections. For example, CPG 7132.10 states, under the heading "Background," that there is some uncer-

tainty whether the Current Good Manufacturing Practice ("CGMP") regulations apply equally to OTC drugs and to prescription drugs. The CPG then states:

POLICY:

The CGMP regulations apply to *all* drug products, whether OTC or prescription.

*Regulatory Guidance:*

The selection of an enforcement action to be applied will be based on the seriousness of the deviation, including such factors as potential hazard to the consumer.

It seems apparent to the court that the first of these quoted paragraphs qualifies as an advisory opinion, and that the second does not. Statements in the "Background" paragraph, which the court has not quoted, would not appear to be advisory opinions, but one would expect that they might be used as aids in interpreting the "Policy" section. *See also* CPGs 7132a.03, 7132b.12, and 7132b.14. It should be noted that in some cases the headings appear not to have been chosen carefully, with what seems to be enforcement guidance appearing under the "Policy" heading. *E.g.*, CPGs 7132a.09, 7132b.03. This occasional confusion does not blur the generally strong differences between the types of statements found in the different sections.

In the court's view, the passages from CPG 7132b.15 relied upon by defendants are not statements of policy or interpretation constituting advisory opinions under 21 C.F.R. § 10.85(d)(3). One passage appears under the heading "Background and Policy," but it does not announce any policy; it merely describes the FDA's perceived best interests as a regulator. The other passage appears under the heading "Regulatory Action Guidance," and advises FDA personnel as to when they should or should not submit samples of drugs for regulatory action consideration. The court does not believe that 21 C.F.R. § 10.85(d)(3) covers statements such as these.

Fourth, the court notes the language of 21 C.F.R. § 10.85(e). The second sentence of that provision states that legal action may not be taken based on "action taken in conformity with an advisory opinion." In

the case of telephone prescriptions, pharmacists can act in conformity with the statement quoted above from CPG 7132b.08, since that statement stipulates that pharmacists are acting in accordance with law if they follow certain procedures in handling a telephone prescription. Defendants cannot claim they have acted "in conformity with" CPG 7132b.15, because that CPG discusses only action to be taken by FDA personnel; it does not purport to address behavior by anyone outside the FDA. This case thus does not appear to fall within the second sentence of 21 C.F.R. § 10.85(e). While the first sentence of 21 C.F.R. § 10.85(e) states more generally that the agency is obligated to follow advisory opinions, the second sentence, directly addressing the question of an advisory opinion barring legal action, may occupy the relevant field. The court doubts that it should hold a legal action barred by the first sentence when it is not barred by the second sentence, which directly addresses the barring of legal actions.

On this basis, on the present record, the court must reject defendants' argument. In addition to these points, three others merit attention. First, there is some authority to the effect that advisory opinions are not binding in court, despite the apparent meaning of 21 C.F.R. § 10.85(e). 21 C.F.R. § 10.85(j) states:

> An advisory opinion may be used in administrative or court proceedings to illustrate acceptable and unacceptable procedures or standards, but not as a legal requirement.

While this provision might be read to mean that advisory opinions cannot impose additional enforceable legal obligations, one district court has read it as meaning that the FDA is not bound by advisory opinions in court. *McIlwain v. Hayes*, 530 F.Supp. 973, 977–78 n. 8 (D.D.C.1981), *aff'd*, 690 F.2d 1041 (D.C.Cir.1982). Second, as the United States argues in its memorandum, enforcement decisions are made by the executive branch, not by the judiciary, and the Government is not lightly to be barred from bringing an enforcement action. While the court does not find it necessary to base its ruling on this argument, the court must acknowledge its force. Third, the United States has informed the court that a new CPG has been issued, CPG 7132b.16, dealing particularly with new drug actions against combination drugs. The court has not had the benefit of the parties' views on the applicability of this new CPG, but it might well be sufficient to defeat defendants' argument based on CPG 7132b.15.

## IV

Defendants request, in the alternative, that the court remand this case to the FDA (or dismiss the case) so that the FDA may make an administrative determination of the toothpaste's new drug status. Although defendants submitted information regarding their combination product very late in the game, that information apparently will be considered in the FDA's assessment of the monograph proposed by the Panel. (Plaintiff's answer to claimant's interrogatory No. 20(a).) Supreme Court dicta suggest that a district court might "stay its hand" in enforcement proceedings to allow the FDA to make a proper administrative determination of a drug's new drug status. *Ciba Corp. v. Weinberger*, 412 U.S. 640, 644, 93 S.Ct. 2495, 2498, 37 L.Ed.2d 230 (1973); *Weinberger v. Bentex Pharmaceuticals*, 412 U.S. 645, 652, 654, 93 S.Ct. 2488, 2493, 2494, 37 L.Ed.2d 235 (1973). The case law indicates that this suggestion has not been embraced warmly by the lower courts, at least to the extent that distribution of the challenged drug would continue unchecked during the pendency of the administrative proceedings. At a bare minimum, it is very clear that a district court is not required to dismiss or remand enforcement proceedings. The Court of Appeals for this Circuit has stated:

> It is inconceivable that Congress intended that, when a preliminary injunction is sought under 21 U.S.C. § 332(a) to protect public health, the district court would be unable to act until the lengthy administrative proceedings necessary to

determine the "new drug" issue have been completed.

*United States v. Mosinee Research Corp.,* 583 F.2d 930, 932 (7th Cir.1978). As it appears to the court, nothing about the present case makes dismissal or remand appropriate.

The United States' brief covers this argument very well, and the court will add only a few observations. The court believes that *IMS Limited v. Califano,* 453 F.Supp. 157 (C.D.Cal.1977), cited by defendants, is distinguishable because it was a declaratory judgment action brought by a drug manufacturer. Defendants address this obvious distinction and offer reasons why it should not make a difference, but the court believes that it does make a difference. The important point is that it is up to the FDA to decide whether it will allow a manufacturer to distribute a product unhindered while the OTC review continues, or whether it will bring an enforcement action in the district court. A manufacturer may not decide to anticipate the FDA's administrative determination by bringing a declaratory judgment action in the district court before any final agency action, but the FDA may decide that an enforcement action in the district court should not be delayed pending completion of lengthy administrative procedures.

Rather than allowing defendants to market their toothpaste pending completion of the OTC review, the FDA has decided to bring an enforcement action in this court. The court is not convinced that there is any good reason to frustrate or delay enforcement by the FDA. The district courts are competent to decide, in enforcement actions, whether a product is or is not a new drug. While the FDA has greater expertise in this area, it has decided to proceed in this court, and the court will not disturb that choice. The court might reconsider if defendants agreed to cease their activities pending completion of the OTC review.

## V

The next step in this litigation would appear to be a motion by the United States for a preliminary injunction. The court does not know whether defendants will oppose such a motion. Because the court will not be sitting for the balance of August, it is setting a status hearing for Friday, August 3. The parties should make every effort to agree, by that date, how this litigation should proceed. The parties should have prepared an agreed form of preliminary injunction order, or they should have agreed on a briefing schedule, or they should be prepared to describe for the court what sort of hearing will be necessary.

Accordingly, the court denies defendants' motion to dismiss or for other relief. This matter is set for a status hearing on Friday, August 3, 1984, at 9:30 a.m., at which time the subject of a preliminary injunction will be discussed.

It is so ordered.

## APPENDIX A

### FOOD AND DRUG ADMINISTRATION

#### COMPLIANCE POLICY GUIDES

#### GUIDE 7132b.15

#### CHAPTER 32b—DRUGS—MISBRANDING

SUBJECT: OTC Drugs—General Provisions and Administrative Procedures for Recognition as Safe and Effective

### BACKGROUND AND POLICY:

An OTC drug listed in subchapter 21 CFR 330 is generally recognized as safe and effective and is not misbranded if it meets each of the conditions of 21 CFR 330.1 and each of the conditions contained in specific final monographs. Following the establishment of a final monograph, any related OTC drug that fails to meet the requirements of the monograph and 21 CFR 330.1 will be recognized as misbranded (section 502 FD & C Act) or as a new drug requiring an approved NDA before it can be marketed (section 505 FD & C Act). Prior to the final publication of a proposed monograph, it would not be in the agency's interest to pursue regulatory action unless failure to do so posed a potential health hazard to the consumer.

REGULATORY ACTION GUIDANCE:

"OTC Drug Monograph Implementation—General Program" includes a discussion of the intent of the monograph program as well as descriptions of the various advisory drug review panels and status of final monographs. This CP indicates that the primary responsibility for determining the compliance of OTC drug products lies with the Bureau of Drugs (HFD–312).

Samples of OTC drugs, subject to a final monograph, should not be submitted for regulatory action consideration under sections 502 or 505 of the FD & C Act without specific instructions from BD to do so.

Samples of OTC drugs, not subject to a final monograph should not be submitted for regulatory action consideration on the basis of suspected labeling deficiencies *unless* there is a reasonable basis to conclude that the deficiency constitutes a potential hazard to health. Examples: 1) documented consumer injuries; 2) drugs requiring the prescription legend marketed as OTC; and 3) unwarranted claims for the treatment of serious disease conditions which could preclude obtaining proper medical attention.

This guideline does not preclude the submission of regulatory action recommendations based upon adulteration charges.